1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT A. BACON, JR.,

           Plaintiff,

    v.

T-MOBILE USA, INC., a Delaware
Corporation,

           Defendant.

Case No. C09-5608RJB

ORDER ON T-MOBILE
USA, INC.'S MOTION
FOR SUMMARY
JUDGMENT

This matter comes before the Court on T-Mobile USA, Inc.'s Motion for Summary Judgment. Dkt. 17. The Court has considered the motion, opposition to the motion, and the file herein.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    FACTS

Plaintiff, Robert Bacon Jr., was employed by Defendant from August of 2004 until he was terminated on December 4, 2008. Dkt. 18-1, at 12, 20. When he was hired with T-Mobile, Plaintiff marked that he was a "disabled veteran" on an company form. Dkt. 30-3, at 29. Plaintiff was a retail store manager. Dkt 19. As a store manager he was responsible for "store operations, including sales, operations, administrative compliance, and managing personnel issues. Dkt. 19. His managers stated that they generally had positive interactions with him, but that Plaintiff could be "argumentative, combative and defensive." Dkt. 18-2, at 3 and 19. Plaintiff states that until October of 2008, he had positive performance reviews. Dkt. 30-1, at 45.

Plaintiff states that after a meeting in April of 2008, he approached his manager, Michelle Vercruysse. Dkt. 30-1, at 28. He states that he told her that the meeting was very stressful for him and that he was going to seek medical help. Dkt. 30-1, at 28. Plaintiff then proceeded to see various physicians. Dkt. 30-1, at 46.

Plaintiff testified that around June of 2008, he told Ms. Vercruysse that he had been diagnosed with Asperger's Syndrome, Attention Deficit Disorder, and Social Anxiety. Dkt. 30-1, at 29. He states that at that time he asked her for help communicating with others. Dkt. 30-1, at 29. He also asked her to "slow [him] down in a meeting if she knows [he's] running off." Dkt. 30-1, at 30. Plaintiff testified that up until that point, Ms. Vercruysse had already been working with him regarding his communication issues. Dkt. 18-1, at 8. According to Plaintiff, he was very blunt in his interactions with others. Dkt. 18-1, at 6-7. She would help him "soften" his approach. Dkt. 18-1, at 6-7. Plaintiff testified that he knew that sometimes people that he worked with misinterpreted his statements, but he usually did not know what he had done wrong. Dkt. 18-1, at 21. He testified that to him "bad communication is in some way threatening, . . . you know cursing, verbally abusive, standing up, flailing your arms around, things like that." Dkt. 18-1, at 21. Plaintiff testified that he would approach Ms. Vercruysse about communications issues, and she would make comments like, "Asperger's is hard." Dkt. 18-1, at 10. He testified that they had "several conversations about his Asperger's Syndrome. Dkt. 18-1, at 10.

In the last few days of September and beginning of October 2008, Plaintiff and several other T-Mobile employees were in Las Vegas for a conference. Dkt. 30-1, at 24. Plaintiff states that while at the conference, he was ill, and began having great difficulty with his asthma. Dkt. 30-1, at 24. He testified that he had a meeting with Ms. Vercruysse and John Delano (Ms. Vercruysse's supervisor), and they discussed that he did not look well and that he was having trouble with his asthma. Dkt. 30-1, at 34. Plaintiff testified that they discussed the fact that he had his back to a keynote speaker at one point during the conference, and that he responded to two text messages during that speech. Dkt. 18-1, at 28-29.

A few hours after that meeting, Plaintiff testified that his asthma attacks progressed to the point where he had to be hospitalized. Dkt. 30-1, at 24. He acknowledges that he was supposed to attend a meeting the morning after he was admitted to the hospital. Dkt. 30-1, at 32. He states that he sent a text message to Ms. Vercruysse telling her that he would not be going. Dkt. 30-1, at 32. Plaintiff testified that

she sent him a text asking why he was not going to the meeting so he sent her a text back and told her again that he was in the hospital. Dkt. 30-1, at 32. At that point she called him, and he told her he had been hospitalized due to his asthma. Dkt. 30-1, at 32-33. While he was in the hospital, Plaintiff testified that a doctor T-Mobile had hired to be at the conference called him about helping him get his luggage from the hotel. Dkt. 18-1, at 25. Plaintiff testified that Ms. Vercruysse then called him with the same information a few times. *Id.* Ms. Vercruysse states that Plaintiff yelled at her and hung up on her. Dkt. 19, at 3. Plaintiff states that another T-Mobile employee, Maria Lopez-Reyher, called him and told him not to be rude to Ms. Vercruysse. Dkt. 18-1, at 25-26. Plaintiff states that he then yelled at her. Dkt. 18-1, at 25-26. Plaintiff states that the regional director of human resources, Albert Galarza, then called him in the hospital and chastised him for losing his temper. Dkt. 30-1, at 48. Plaintiff states that his "frustration skyrocketed." Dkt. 30-1, at 48. He states that he was given an IV drip of steroids for his asthma. Dkt. 30-1, at 24. He attributes his argumentative behavior at the time to the drugs he was given and the fact that he was in the hospital away from home. Dkt. 30-1, at 24. Plaintiff also states that he was not given the medication that he usually takes for depression and help controlling his emotions. Dkt. 30-1, at 25. He states that he was very anxious. Dkt. 30-1, at 25.

While Plaintiff was still on leave with his illness, Ms. Vercruysse, Mr. Galarza, and Mr. Delano met to discuss whether T-Mobile was still a good fit for Plaintiff. Dkt. 30-2, at 21. Ms. Vercruysse testified that they discussed Plaintiff's behavior prior to the meeting in Las Vegas, "and some of the conversations that had taken place prior to that and felt that - it was consistent in terms of his behaviors." Dkt. 30-2, at 23. She then testified that "coupled with the fact that trying to accommodate and help and he hangs up on me and yells at me and is yelling at Marina, as well, those behaviors all were consistent with what was experienced through our other conversations." Dkt. 30-2, at 23. She states that they discussed whether this was a "pattern," that he was not changing, and whether he should stay at T-Mobile. Dkt. 30-2, at 23.

Plaintiff states that when he returned home, he sent out an email, trying to explain and apologizing for his behavior while in Las Vegas. Dkt. 30-1, at 49.

Around a week after Plaintiff returned to work, on October 21, 2008, Ms. Vercruysse and Mr. Galarza discussed his behavior at the Las Vegas conference and his overall job performance with

1  Plaintiff.  Dkt. 21, at 2.  Plaintiff was told that he should take a couple of days and decide if he intended to

2  remain at T-Mobile.  Dkt. 21, at 2.

3      Plaintiff e-mailed Mr. Galarza on October 23, 2008, asking for a written explanation of T-

4  Mobile's concerns "due to [his] disability."  Dkt. 21, at 7.  Mr. Galarza stated that this was the first time

5  he was aware that Plaintiff might have a medical condition that interfered with his ability to perform his

6  work.  Dkt. 21, at 2.

7      On October 28, 2008, T-Mobile issued Plaintiff a "decision time memo" which is the equivalent of

8  a final warning.  Dkts. 19, at 2 and 39.  The "decision time memo" stated that Plaintiff was not "living T-

9  Mobile Values," was behaving unprofessionally, was abrasive, insubordinate and argumentative.  Dkt. 19,

10 at 39.  Plaintiff was given an opportunity to either commit to immediate improvement or leave the

11 company.  Dkt. 19, at 39.  Plaintiff states that if he chose to stay, he would lose eligibility for some of the

12 company's benefits.  Dkt. 30-1, at 49.  Plaintiff opted to stay.  Dkt. 30-1, at 49.

13     Plaintiff states that after receiving the "decision time memo," he called Mr. Galarza and told him

14 he felt he was being discriminated against due to his disability.  Dkt. 30-1, at 49.

15     On November 6, 2008, Plaintiff submitted written requests for accommodations for his Asperger's

16 Syndrome, Attention Deficit Hyperactivity Disorder, and social anxiety disorder.  Dkt. 21, at 9.  In

17 support of his request, Plaintiff provided the opinion of Bradley W. Strong, M.D., who opined that

18 Plaintiff's conditions were "moderately severe" and affected his interpersonal communication skills and

19 ability to communicate, both in writing and orally.  Dkt. 21, at 15.  Dr. Strong further opined that Plaintiff

20 needed the following accommodations:

21      - Provide clear concrete examples of inappropriate behavior and communications with
        their consequences in a timely fashion
22     - Allow Mr. Bacon to opt out of social functions that are not essential to conduct of his job
        description, i.e. after hours social functions and functions not directly related to conduct of
23     business
       - Allow for instructions to be provided in both oral and written form
24     - Provide written agenda prior to meetings with supervisors including topics for discussion
        and questions of concern
25     - Provide a written summary of meeting with supervisors to allow for review
       - Provide sensitivity training regarding Asperger's Disorder for supervisors and peers
26     - Provide a co-worker or peer for any formal meetings with supervisors involving
        disciplinary or job performance review
27
   Dkt. 21, at 15.  On November 19, 2008, Mr. Galarza informed Plaintiff that T-Mobile could provide five
28
   of the seven requested accommodations.  Dkt. 21 at 2.  T-Mobile was unwilling to provide sensitivity

training on Asperger's or allow a co-worker or peer to attend meetings with supervisors involving

disciplinary or job performance review.  Dkt. 21, at 2 and 17.

Plaintiff acknowledged that in late October/early November 2008, he told one of his employees,

Amanda Laintz, that she could bring her children to the store for the last half an hour of her shift once a

month on Sunday to accommodate her childcare needs.  Dkt. 30-1, at 38.  He testified that the store did

very little business on Sunday evenings, and always had two employees on duty.  Dkt. 30-1, at 38.  He

testified that her job duties did not require that she go in and out of the back room.  Dkt. 30-1, at 38.

Plaintiff stated that he gave her permission to have the children in the public areas of the store, which was

not against company policy, but did not give Ms. Laintz permission to allow the children in the back room

of the store.  Dkt. 30-1, at 38-39.  He testified that he was surprised that she allowed them back there

unattended as they were young, and he felt that was not safe.  Dkt. 30-1, at 39-40.

On November 17, 2008, Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC").  Dkt. 30-2, at 37.

On November 24, 2008, Ms. Laintz sent an email to Ms. Vercruysse complaining of Plaintiff's

conduct in the work place.  Dkt. 19, at 42-43.  Ms. Vercruysse states that she then spoke to Ms. Laintz

about Plaintiff.  Dkt. 19, at 4.

On November 28, 2008, the EEOC sent a "Notice of Charge of Discrimination" to T-Mobile

regarding Plaintiff.  Dkt. 30-2, at 35.

On December 2, 2008, Ms. Laintz sent another email to Ms. Vercruysse. Dkt. 19, at 47.  Ms.

Laintz complained about being scheduled on Sundays (and the fact that certain other employees were not

scheduled then) despite Plaintiff's assurance that she would not work that shift.  Dkt. 19, at 47.  Ms.

Laintz then related that as a compromise, Plaintiff gave her permission to have the children in the store

for the last half hour of her shift.  Dkt. 19, at 47.  Ms. Vercruysse states that on December 2, 2008, she

reviewed the video tape for the store and saw the children in the back room of the store, an area that is not

open to the public, on three Sundays.  Dkt. 19, at 4.  (This tape was not produced during discovery, and

Defendant states that it is lost. Dkt. 30-2, at 33.)  Ms. Vercruysse states that allowing the children in the

back room violated T-Mobile's Loss Prevention Policy.  Dkt. 19, at 4.  T-Mobile maintains various

policies intended to protect employees and assets from harm or loss - the Loss Prevention Policy.  Dkt.

17. The Loss Prevention Policy provides, in part, that only visitors "with a bonafide business purpose were allowed in non-public areas," should be with an escort, and that family and friends were restricted to public areas of the store. Dkt. 19, at 45.

On December 3, 2008, Plaintiff received an email from Mr. Galarza stating that Plaintiff was to attend a meeting on December 4, 2008, to discuss "policy and procedure." Dkt. 30-1, at 50. After Plaintiff requested more information, Mr. Galarza emailed him back and stated that "[w]e will ask you about store operations." Dkt. 30-3, at 51.

On December 4, 2008, Ms. Vercruysse, Mr. Delano, and Mr. Galarza met with Plaintiff. Dkt. 19, at 5. They told Plaintiff that he was being terminated for allowing Ms. Laintz to bring her children to work, and allowing her to place them in the store's back room. Dkt. 19, at 5. At the time they made the decision to terminate him, Ms. Vercruysse and Mr. Galarza states that they was not aware of any other manager who had violated the policy that prevents unauthorized people in the back rooms of the stores, or a manager that allowed an employee to bring preschool children to the store while she worked. Dkts. 19, at 5 and 21, at 3. Mr. Delano states that he was also unaware of any other T-Mobile employee that allowed non-authorized people in the back room of the stores. Dkt. 20, at 3. Plaintiff states that he was told that allowing Ms. Laintz to bring her children into the back room of the store violated company policy, and that violating company policy was a violation of his "decision time memo," and resulted in his termination. Dkt. 30-1, at 51.

Plaintiff testified that he knew that his former supervisor, Lori Smith, allowed her children in the non-public areas of the store while working. Dkt. 30-1, at 51. Sophie Tsohonis, a T-mobile employee, testified that she occasionally brought her children to work and into the non-public areas of the store. Dkt. 30-1, at 54. Neither was terminated.

**B.    PROCEDURAL HISTORY**

On September 3, 2009, Plaintiff filed this case alleging that Defendant discriminated against him and failed to accommodate his disability contrary to Washington Law Against Discrimination ("WLAD"), RCW 49.60, *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. Dkt. 1. He asserts that Defendants violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2654, *et seq*. *Id*. He makes reference to 42 U.S.C. § 2000E. *Id*. Plaintiff also asserts that the Defendant intentionally

1   or negligently inflicted emotional distress upon him.  *Id*.  Plaintiff seeks damages, attorneys' fees, and

2   costs.  *Id*.  Trial is set for September 27, 2010.  Dkt. 7.

3   **C.      PENDING MOTION**

4        T-Mobile moves for summary dismissal of all Plaintiff's claims, arguing that:  1) his state and

5   federal discrimination claims should be dismissed because he has failed to state a prima facie case and T-

6   Mobile had a legitimate non-discriminatory basis for terminating him, 2) there is no evidence to support a

7   claim for failure to accommodate, 3) T-Mobile did not interfere with his FMLA rights, and 4) Plaintiff's

8   claims of negligent and intentional infliction of emotional distress should be dismissed due to lack of

9   evidence.  Dkts. 17 and 34.

10       Plaintiff responds, and argues that: 1) he has stated a prima facie case for disability discrimination

11  and there is evidence of pretext, 2) Defendant failed to reasonably accommodate Plaintiff, 3) T-Mobile

12  retaliated against Plaintiff, 4) T-Mobile interfered with Plaintiff's rights under the FMLA, and 5)

13  Defendant's agents' conduct, while Plaintiff was in the hospital, is sufficient evidence on his intentional

14  or negligent emotional distress claims.  Dkt. 32.

15                      **II.      <u>DISCUSSION</u>**

16  **A.      SUMMARY JUDGMENT - STANDARD**

17       Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and

18  admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

19  material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The

20  moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a

21  sufficient showing on an essential element of a claim in the case on which the nonmoving party has the

22  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for

23  trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving

24  party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party

25  must present specific, significant probative evidence, not simply "some metaphysical doubt."); *See also*

26  Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient

27  evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

28  of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac.*

1    *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

2         The determination of the existence of a material fact is often a close question.  The court must

3    consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

4    preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809

5    F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party

6    only when the facts specifically attested by that party contradict facts specifically attested by the moving

7    party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at

8    trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809

9    F.2d at 630 (relying on *Anderson, supra).* Conclusory, non specific statements in affidavits are not

10   sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89

11   (1990).

12   **B.      DISABILITY DISCRIMINATION CLAIM UNDER ADA AND WLAD**

13        The Ninth Circuit and Washington courts apply the burden shifting scheme announced in

14   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to claims of employment discrimination in

15   violation of the ADA and WLAD.  *Gambini v. Total Renal Care, Inc*., 486 F.3d 1087 (9th Cir. 2007);

16   *Snead v. Met. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1093 (9th Cir. 2001); and *Anica v. Wal-Mart Stores,*

17   *Inc.,* 120 Wn.App. 481 488 (2004).  Under the *McDonnell Douglas* scheme, a Plaintiff must first

18   establish a prima facie case of discrimination because of a disability.  *Snead,* at 1093.  The burden then

19   shifts to the employer "to provide a non-discriminatory reason for that discharge which disclaims any

20   reliance on the employee's disability in having taken the employment action."  *Id*. (*internal citations*

21   *omitted*).  If the employer does so, then a plaintiff  bears the burden of showing that the employer's reason

22   for termination was pretextual.  *Id.*

23                **1.      *Plaintiff's Prima Facie Case***

24        Under the ADA, 42 U.S.C. § 12112(a), employers are prohibited from discriminating against

25   "qualified individuals with a disability" in the terms, conditions, and privileges of employment.  To make

26   a claim under the ADA, an employee bears the ultimate burden of proving that he is: "(1) disabled under

27   the Act, (2) a qualified individual with a disability, and (3) discriminated against because of the

28   disability."  *Bates v. United Parcel Service, Inc.,* 511 F.3d 974, 988 (9th Cir. 2008)(*internal quotations*

*omitted*).  A similar standard is used for a claim under WLAD.  *Gambini v. Total Renal Care, Inc*., 486 F.3d 1087, 1093 (9th Cir. 2007).  Parties are not disputing that Plaintiff is "disabled under the Act," or that he was a "qualified individual with a disability, so this opinion will address the third prong.

"The ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for accommodation - a motivating factor standard."  *Dark v. Curry County*, 451 F.3d 1078, 1085 (9th Cir. 2006).

Plaintiff points to two adverse employment actions:  the "decision time memo," and his termination.  Dkt. 32.  Viewing the facts in a light most favorable to Plaintiff, there is sufficient evidence that T-Mobile's decision to issue a "decision time memo," which included a loss of benefits, was motivated by Plaintiff's disability.  According to Plaintiff, his supervisor, Ms. Vercruysse was aware that he had Asperger's Syndrome, Attention Deficit Disorder, and Social Anxiety Disorder as early as June of 2008.  Dkt. 30-1, at 29.  Plaintiff testified that in June of 2008, he asked Ms. Vercruysse for help communicating with others and to let him know if he is not acting appropriately in a meeting.  Dkt. 30-1, at 29-30.  Plaintiff testified that she would help him "soften" his approach.  Dkt. 18-1, at 6-7.  He states that when she would help him with his communication issues, she would make comments like "Asperger's in hard."  Dkt. 18-1, at 10.  A jury could conclude from these facts that his supervisor knew of his disabilities and one of the main symptoms of his Asperger's Syndrome - difficulty in communicating appropriately with others.

A jury could conclude that the issuance of the "decision time memo" was directly motivated by the symptoms of his disability.  The Ninth Circuit has specifically held that "[c]onduct resulting from a disability is part of the disability and not a separate basis for termination," *Gambini v. Total Renal Care, Inc*., 486 F.3d 1087, 1093 (9th Cir. 2007), or in this case issuance of the memo - an undisputed adverse employment action.  In *Gambini,* a woman with bipolar disorder was discharged after having "violent outbursts" which the Court found to be "arguably symptomatic of her bipolar disorder."  *Id.*  Her employer stated that she was terminated due to her behavior.  *Id*.  The Court found that the jury was entitled to infer reasonably that "her 'violent outburst' . . . was a consequence of her bipolar disorder, which the law protects as part and parcel of her disability."  *Id.*  The *Gambini* Court concluded that "if the law fails to protect the manifestations of her disability, there is no real protection in the law because it

would protect the disabled in name only." *Id.,* at 1094-95.  As was the case in *Gambini*, there is evidence in the record that his supervisors were aware that Plaintiff had trouble communicating appropriately with others because of his Asperger's Syndrome.  Moreover, the "Decision Time Memo" was based, according to T-Mobile, on Plaintiff not "living T-Mobile values," his unprofessional behavior, abrasiveness, insubordination and argumentative nature.  Dkt. 19, at 39.  Just prior to issuing the memo, Ms. Vercruysse testified that she, Mr. Galarza, and Mr. Delano met and discussed Plaintiff's behavior.  Dkt. 30-2, at 21. She testified that they discussed that his  Plaintiff's conduct prior to the meeting in Las Vegas, at the conference, and while he was in the hospital.  Dkt. 30-2, at 23.  They concluded that it was all "consistent in terms of his behaviors." Dkt. 30-2, at 23.  Further Defendant does not dispute that, for example, Plaintiff's yelling at people while he was on steroids in the hospital was arguably consistent with his Asperger's Syndrome.  A jury could conclude that the decision to issue the memo was a arguably a direct result of his "conduct resulting from his disability." *Gambini*, at 1093.

In *Gambini,* the Plaintiff raised her claims under the ADA and the WLAD, as did Plaintiff here. The Ninth Circuit remanded the case on both claims, as they both use the same standard.  Accordingly, Plaintiff's ADA and WLAD claims should not be dismissed.

Moreover, there are issues of fact as to whether the decision to terminate him was motivated by his disability.  First, the timing of the decision to terminate him, within two months of the Las Vegas conference events, and within a month of his formal request for accommodations for his disabilities, is sufficient for a jury to conclude that the decision to terminate him was motivated by his disability. Further, Plaintiff states that he was told that allowing Ms. Laintz to bring her children into the back room of the store violated company policy, and that violating company policy was a violation of his "decision time memo," and resulted in his termination.  Dkt. 30-1, at 51.  As above, there are facts in the record from which a jury could infer that the decision to issue the "decision time memo" was motivated by Plaintiff's disability.  To the extent that a jury concludes T-Mobile relied on the memo for his termination, it could also conclude that T-Mobile was motivated by Plaintiff's disability.

Plaintiff has met his prima facie burden as to this claim on both the adverse employment actions he alleges.

> 2.    *T-Mobile's Proffered Non-Discriminatory Reason for Employment Actions*

1   T-Mobile argues that its decision to issue the "decision time memo" and to terminate Plaintiff was

2   unrelated to his disability.  Dkts. 17 and 34.  T-Mobile failed to meet its burden here.  T-Mobile

3   acknowledges that the decision was based on Plaintiff's behavior, which is arguably  consistent with the

4   symptoms of his disability.  This Court, like the *Gambini* Court, is not unsympathetic to T-Mobile's

5   plight as an employer.  As stated in *Gambini*, employees with disabilities do not have "absolute protection

6   from adverse employment actions based on disability-related conduct."  *Id.,* at 1095.  It further provided

7   that:

8           Under the ADA a plaintiff must still establish that she is "an individual with a disability
        who, with or without reasonable accommodation, can perform the essential functions of
9       the employment position that such individual holds or desires."  Washington law has a
        similar provision: "[T]he prohibition against discrimination because of such disability shall
10      not apply if the particular disability prevents the proper performance of the particular
        worker involved." Even if a plaintiff were to establish that she's qualified, under the ADA
11      the defendant would still be entitled to raise a "business necessity" or "direct threat"
        defense against the discrimination claim.

12  *Id.*  Defendant here does not raise either the "business necessity" or "direct threat" defense.

13      T-Mobile has failed to meet its burden in regard to its decision to issue the "decision time memo,"

14  at this stage in the *McDonnell Douglas* burden shifting scheme, and so the motion to summarily dismiss

15  this claim, on the basis of issuance of the memo, should be denied.

16      T-Mobile argues that the decision to terminate Plaintiff was based on his violation of the Loss

17  Prevention Policy.  Dkt. 17.  It argues that this is a non-discriminatory reason to dismiss him.  T-Mobile's

18  proffered reason is sufficient on this portion of the claim.  The next relevant inquiry is whether there is

19  evidence of pretext.

20              3.      *Plaintiff's Evidence of Pretext*

21      If the employer is able to articulate a non-discriminatory reason for its adverse employment

22  actions, a plaintiff must then show that the proffered reason is pretextual.  *Snead.,* at 1093.  A plaintiff

23          must have availed himself of the opportunity to demonstrate that the proffered reason was
        not the true reason for the employment decision. This burden now merges with the ultimate
24      burden of persuading the court that he has been the victim of intentional discrimination.
        He may succeed in this either directly by persuading the court that a discriminatory reason
25      more likely motivated the employer or indirectly by showing that the employer's proffered
        explanation is unworthy of credence.
26

27  *Dark*, at 1085 (*citing Snead* at 1093-94).

28      Plaintiff has succeeded in showing sufficient evidence that the decision to terminate him for

allowing a subordinate to violate the company policy of not allowing unauthorized people in the back room was a pretext for discrimination. Plaintiff states that he did not authorize Ms. Laintz to allow her children in the back room. The record does contain evidence of supervisors and others who had children in the back room of various stores, and that they were not fired for it. A "showing of pretext is bolstered by comparative evidence." *Dark*, at 1086. Plaintiff has pointed to sufficient evidence in the record from which a jury could conclude that his termination for violation of company policy was a pretext for discrimination. The motion to summarily dismiss Plaintiff's discrimination claims under both the ADA and WLAD should be denied.

### C.      FAILURE TO ACCOMMODATE UNDER ADA AND WLAD

Both the ADA and WLAD require employers to make reasonable accommodation for employees with disabilities. 42 U.S.C. § 12111(8) and RCW 49.60.180. "The ADA's definition of discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Dark,* at 1088 (*citing* 42 U.S.C. § 12112(b)(5)(A)). In order to evaluate a failure to accommodate claim, in addition to showing that they were disabled and qualified to perform the essential functions of the job, plaintiffs must show that there exists "a reasonable accommodation" that would enable them to perform the essential functions of their job. *Zukle v. Regents of University of California,* 166 F.3d 1041, 1046-47 (9th Cir. 1999). The burden then shifts to the employer to show either, the accommodation imposes an undue hardship or that the requested accommodation would not enable the employee to perform the essential functions of their position. *Id.,* at 1047.

####      1.      *Plaintiff's Prima Facia Case*

Parties do not contest that Plaintiff was disabled or qualified for his position. The issue, then, is over whether Defendant actually followed through with the accommodations that it stated it would give and whether all Plaintiff's accommodations were "reasonable."

There are issues of fact as to whether Defendant failed to follow through with the accommodations that it stated that it would give. For example, Plaintiff argues that Defendant failed to provide a written agenda prior to the meeting in which he was terminated that included topics for discussion and questions

1    of concern.  Dkt. 32.  The record does contain emails from Ms. Galarza informing Plaintiff of the

2    meeting.  Dkts. 30-3, at 50-51.  There are issues of fact as to whether they sufficiently complied with the

3    accommodation.

4         Plaintiff argues that T-Mobile failed to give him one of his requested accommodations: that of

5    providing sensitivity training on Asperger's Syndrome for his supervisors and peers.  Dkt. 32.  There are

6    issues of fact as to whether this accommodation was reasonable.  To avoid summary judgment, Plaintiff

7    "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of

8    cases." *Dark,* at 1088.  In support of its reasonableness, Plaintiff points to the fact that his physician

9    suggested it.  Dkt. 21, at 15.  The burden now shifts to T-Mobile.

10                    2.    *T-Mobile's Burden*

11        T-Mobile does not state that providing training on Asperger's would be a hardship.  Instead it

12    argues that providing sensitivity training to Plaintiff's peers and supervisors does not help him perform

13    the core functions of his job.  Dkt. 17 and 34.  It argues that sensitivity training for others does not help

14    Plaintiff alter his behavior.  *Id.*

15        There are issues of fact as to whether this accommodation was reasonable.  Plaintiff offers the

16    testimony of Steven Craig Altabet, Ph.D. Dkt. 30-3, at 59-60.  Dr. Altabet testified that people with

17    autism spectrum disorders, including Asperger's Syndrome, have disabilities involving social interaction.

18    Dkt. 30-3, at 59.  He testified that in order for the interaction to be successful, "not just the person with

19    the disability had to be able to function adequately."  Dkt. 30-3, at 59.  He opined that training others in

20    the work place about the disorder would help the person with the disability by giving co-workers "more

21    tolerance and understanding."  Dkt. 30-3, at 59.  He opined that co-workers were less likely to

22    misinterpret "certain behaviors as being intentionally . . . rude or obnoxious . . [they] are able to cooperate

23    better."  *Id.*  He opined further that training other people in the work place may help to learn to ask

24    questions a certain way, and be aware that people with Asperger's Syndrome may be sensitive to noise.

25    *Id.*  Summary judgment on the failure to accommodate claim should not be granted.

26        **D.    ADA RETALIATION**

27        In his Response to the Summary Judgment Motion, Plaintiff now attempts to argue that his claim

28    for retaliation under the ADA should not be dismissed.  Dkt. 32.  In its Reply, Defendant properly points

ORDER
Page - 13

1    out that not only did Plaintiff not raise a retaliation claim in his EEOC Complaint (Dkt. 30-2, at 35-39), he

2    fails to make a claim for retaliation in his Complaint filed in this case.  Dkt. 34.  Further, Defendant did

3    not move to dismiss this claim.  The Court is without a basis to act.  This claim is not a part of this case,

4    nor has Plaintiff moved to amend his Complaint to add a claim for retaliation.

5        **D.    FMLA CLAIM**

6            In order to make a claim under the FMLA, a plaintiff must show that 1) they took FMLA-

7    protected leave, 2) they suffered an adverse employment action, and 3) the adverse employment action

8    was causally related to the FMLA leave.  *Bachelder v. American West Airlies,* 259 F.3d 1112, 1124 (9th

9    Cir. 2001).

10           Plaintiff has failed to show that there was any adverse employment action which was causally

11   connected to his FMLA leave.  Plaintiff argues that the decision to issue the "decision time memo" was

12   caused, in part, by his taking FMLA leave after the conference in Las Vegas.  Dkt. 32.  Plaintiff points to

13   the testimony of a Tehra Bean who alleges that she heard from another individual that he was under the

14   impression that Ms. Vercruysse was upset because Plaintiff's taking leave was "bad for business."  Dkt.

15   32.  Defendant properly objects to the admission of this evidence as hearsay.  This evidence should be

16   excluded.  Plaintiff points to no other evidence linking any adverse employment action to his taking leave.

17   Further, Plaintiff testified that he received all the medical leave that he requested.  Dkt. 18-1, at 17-18.

18   Plaintiff points to no evidence in the record that Defendant interfered with his rights under the FMLA.

19   The claim should be dismissed.

20       **E.    STATE LAW CLAIMS OF INTENTIONAL AND NEGLIGENT INFLICTION OF**
         **EMOTIONAL DISTRESS**
21
             1.    *Intentional Infliction of Emotional Distress*
22
             In order to maintain a claim for intentional infliction of emotional distress or outrage, a plaintiff in
23
     Washington must show "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of
24
     emotional distress; and (3) actual result to the plaintiff of severe emotional distress."  *Birklid v. Boeing*
25
     *Co.*, 127 Wash.2d 853, 867 (1995)(*internal citations omitted*).  The conduct in question must be "so
26
     outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to
27
     be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*  Although whether
28
     conduct is sufficiently outrageous is ordinarily a question for the jury, the trial court must decide as a

1   threshold matter, whether reasonable minds could differ about whether the conduct was so extreme as to

2   result in liability. *Dicomes v. State*, 113 Wash.2d 612, 630 (1989).

3       Plaintiff argus that the basis for his intentional and negligent infliction of emotional distress

4   claims is based on the Defendant's employees conduct while Plaintiff was in the Las Vegas hospital.  Dkt.

5   32.  Plaintiff fails to meet the threshold question on his intentional infliction of emotional distress claim.

6   That is reasonable minds could not differ about whether T-Mobile's employees' treatment of Plaintiff

7   while he was in the Las Vegas hospital "was so extreme  as to result in liability," *Dicomes*, at 630.  It was

8   not.  Plaintiff fails to point to any evidence from which a jury could conclude that the various people's

9   attempts to talk with Plaintiff about getting his luggage from the hotel to the hospital, and helping him

10  make travel arrangements home was in any manner extreme or outrageous.  Further, Plaintiff fails to point

11  to evidence that the other T-Mobile employees, even if they yelled at him for being rude to other

12  employees was conduct "so outrageous in character, and so extreme in degree, as to go beyond all

13  possible bounds of decency. . . ." *Birklid*, at 867, in the circumstance.  Plaintiff makes no showing that

14  unpleasantness alone is sufficient under Washington law to constitute a claim for outrage.  This claim

15  should be dismissed.

16                  2.   *Negligent Infliction of Emotional Distress*

17      A Washington plaintiff can recover for negligent infliction of emotional distress if he proves:  (1)

18  negligence, i.e., duty, breach, proximate cause, and injury; and (2) the additional requirement of objective

19  symptomatology.  *Kloepfel v. Bokor*, 149 Wash.2d 192, 199 (2003); *Segaline v. State Department of*

20  *Labor and Industries,* 144 Wash. App. 312, 327 (2008).

21      Plaintiff does not met the first portion of the test for a negligent infliction of emotional distress

22  claim - negligence.  First, Plaintiff fails to articulate what duty is to be imposed upon Defendant as his

23  employer.  "There is no duty to for an employer to provide employees with a stress free work place.

24  *Snyder v. Medical Service Corp. of Western Washington,* 145 Wash.2d 233, 243(2001).  "Under

25  established notions of negligence, a duty is owed to others only with respect to those risks or hazards

26  whose likelihood made the conduct unreasonably dangerous. Conduct is unreasonably dangerous when its

27  risks outweigh its utility." *Bishop v. State*, 77 Wash. App. 228, 234 (1995) (*internal citations omitted*).

28  "The utility of permitting employers to handle workplace disputes outweighs the risk of harm to

ORDER
Page - 15

employees who may exhibit symptoms of emotional distress as a result." *Id.* "Absent a statutory or public policy mandate, employers do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." *Id.,* at 235.  Evening assuming that Defendant owed Plaintiff a duty, Plaintiff makes no showing on the remaining negligence elements.  In any event Defendant's duty and any violation thereof, are subsumed in the other claims in the case.  Plaintiff's claim for negligent infliction of emotional distress should be denied.

### III.   ORDER

Therefore, it is hereby **ORDERED** that T-Mobile USA, Inc.'s Motion for Summary Judgment (Dkt. 17) is

• **DENIED** as to Plaintiff's claims for:

  • Disability discrimination under the ADA and WLAD, and

  • Failure to accommodate under the ADA and WLAD;

• **GRANTED** as to Plaintiff's claims for:

  • interference with his FMLA rights, and

  • Intentional and negligent infliction of emotional distress.

• Plaintiff's claims for interference with his FMLA rights, and intentional and negligent infliction of emotional distress are **DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 23rd day of August, 2010.

Robert J. Bryan
United States District Judge

ORDER
Page - 16